[Cite as *Rau v. Miami Valley Hosp.*, 2025-Ohio-13.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

GREGORY J. RAU ET AL.           :

    Appellants                :    C.A. No. 30032

v.                             :    Trial Court Case No. 2021 CV 01336

MIAMI VALLEY HOSPITAL ET AL.    :    (Civil Appeal from Common Pleas
                                     :    Court)

    Appellees                 :

                                     :

. . . . . . . . . . .

O P I N I O N

Rendered on January 3, 2025

. . . . . . . . . . .

RONALD M. WILT, NANCY SCHOOK HENRY, & NICHOLAS R. BONSIGNORE, Attorneys for Appellants

BRIANNA M. PRISLIPSKY, SUSAN BLASIK-MILLER, MEREDITH C. TURNER-WOOLLEY, Attorneys for Appellees

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Plaintiffs-Appellants Gregory J. Rau ("Rau") and Bette Rau appeal from the trial court's entry of judgment in favor of Defendants-Appellees Dr. Thomas Cook and Orthopedic Associates of Dayton, Inc. ("Defendants"), following a jury trial in this medical

malpractice action. The Raus advance two assignments of error on appeal, including that the trial court erred (1) by allowing the admission of evidence concerning informed consent and discussions with Rau regarding the risks and complications of knee replacement surgery and (2) by allowing Defendants to present cumulative expert testimony. For the reasons outlined below, we reverse the judgment of the trial court.

## I. Background Facts and Procedural History

{¶ 2} The personal injury action stems from an October 22, 2019, bilateral knee replacement surgery performed on Rau by Dr. Cook at a surgical center. Immediately following the surgery, Rau was transported to a post-anesthesia care unit (PACU) in stable condition. At approximately 12:30 p.m., Rau was transferred from PACU to the ward, and his initial limb assessment performed by the receiving nurse was normal. At around 2:30 p.m., however, Rau complained of pain radiating from his foot to his calf in his right leg, and his right foot was cold. His nurse could not find his pedal pulse, so she tried to contact Dr. Cook. At that time, however, Dr. Cook was unavailable in another surgery, so the nurse contacted her director of nursing who was able to get a message to Dr. Cook.

{¶ 3} At around 3:40 p.m., before leaving the surgical center, Dr. Cook assessed Rau and ordered heat therapy for his right leg, resumption of home medications, and ambulation. After briefly walking through the hall at around 4:40 p.m., Rau reported an increase in pain and numbness in his right foot radiating up his calf. His nurse called Dr. Cook to report the changes in Rau's condition, and Dr. Cook stated that he would call Miami Valley Hospital to arrange for Rau's transfer because he would not be able to

receive the necessary care at the surgical center.

{¶ 4} Rau arrived at Miami Valley Hospital approximately two hours later. Upon his arrival, the surgical resident on duty recognized that he needed surgery to salvage his leg. At that time, Miami Valley Hospital was unable to offer the required surgery because its vascular surgeons were unavailable, so Rau was transferred emergently via life flight to the University of Cincinnati Medical Center ("UC") for surgery. At UC, Dr. Joseph Giglia operated on Rau and determined that his right popliteal artery had been injured earlier that day during his knee replacement surgery.

{¶ 5} On April 2, 2021, the Raus filed their initial complaint against Defendants; they amended their complaint on October 5, 2021, and again on May 30, 2023. They asserted claims for medical negligence and loss of consortium and sought a jury trial. No claim for lack of informed consent was ever asserted.

{¶ 6} Prior to trial, the Raus filed motions in limine to exclude evidence of informed consent and risk of injury to neurovascular structures from knee replacement surgery and to exclude cumulative expert testimony. Their theory at trial was that Dr. Cook had negligently cut Rau's popliteal artery during surgery and then delayed diagnosis of the injury and treatment. They presented evidence that Dr. Giglia found that Rau's popliteal artery had a hole in it, resulting in a hematoma; that Rau had required emergency surgery with arterial bypass and fasciotomies to prevent the loss of his right leg; and that Rau had experienced an approximate seven-hour delay in treatment from the presentation of his symptoms related to his popliteal artery injury to the reparative surgery. They alleged that Rau has permanent nerve injury in his right leg affecting his daily life.

{¶ 7} The matter proceeded to jury trial on December 11, 2023. At the close of voir dire, the Raus requested that the trial court rule on the two motions in limine because Dr. Cook's counsel had questioned potential jurors about their knowledge that surgery has risks and that medical complications can occur in the absence of negligence. During arguments, Dr. Cook's counsel stated that their "entire defense" was based on the contention that Rau had accepted the risks of knee replacement surgery and that cutting an artery during surgery was a known risk that could occur without negligence. Defense counsel specifically stated: "And our position was it was a known and accepted risk, and it was disclosed to the patient . . . that's our whole defense."

{¶ 8} The trial court granted the Raus' motion in limine to exclude cumulative expert testimony to the extent that each expert was only permitted to testify as to his or her expertise and opinion. The trial court also granted the Raus' motion in limine to exclude evidence of informed consent and risks and complications from knee surgery, explaining that the prejudicial effect of such evidence was significant and questioning its relevance. The trial court stated that such evidence was "going to confuse the jury" and that "plaintiffs can't sign away their breach of standard of care."

{¶ 9} Defense counsel then argued that Defendants did not plan to show the informed consent form to the jury but intended to talk about how the risk of neurovascular injury from the procedure had been discussed with Rau. The Raus' counsel then argued that Defendants were not permitted to present evidence that Rau had agreed to a specific risk, such as neurovascular or arterial injury, and were also precluded from presenting any evidence relating to informed consent discussions or specific risks. The trial court

ultimately concluded "as it pertains to motion to exclude events of informed consent, risk of injury from the knee surgery, again the Court is going to grant that motion as to the general discussions of the general risks, no specifics. The prejudicial effect does outweigh the probative value. It's still going to confuse the jury." The court then generally agreed that defense counsel could talk about the fact that Rau's injury was a known risk that could occur in the absence of negligence.

{¶ 10} During the trial, Rau testified that, before his knee replacement surgery, he had been told that he would be able to resume his activities without pain after surgery. He also testified that he had signed a consent form at UC for possible amputation of his leg after he was transferred there. Defense counsel objected to Rau's testimony and argued that this testimony had opened the door to all evidence of informed consent and of the specific risks of knee replacement surgery, which the trial court had previously ruled could not be admitted. The trial court overruled defense counsel's objection, restating that evidence of "generalizations of risk" but "nothing specific" were admissible. The court also reiterated that defense counsel was allowed to describe the general discussion concerning risks but not specifically "which risks."

{¶ 11} The trial court allowed Defendants to present testimony from four medical experts. Dr. William Abraham first testified as an expert orthopedic surgeon on behalf of Defendants, opining that Dr. Cook had acted reasonably and carefully within the standard of care in his treatment of Rau. He testified that there is a risk of neurovascular injury, including injuries to an artery, associated with total knee replacement surgery. In explaining the risks of total knee replacement, Dr. Abraham stated:

Q.      Tell the ladies and gentlemen, is there a risk of neurovascular injury associated with total knee replacement?

A.      Yes.

Q.      . . . And when I said neurovascular, tell the jury what you mean when you say neurovascular.

A.      Everything from nerve, vein, artery, and it's sort of all lumped together, I guess.

Q.      *With respect to total knee replacement, is injury to an artery a known and accepted risk and complication in your understanding of the procedure?*

A.      *Yes. I mean, I think that without question there are injuries, situations where it is considered to be a known and very much accepted risk of the operation.*

Q.      What are some of the other risks of a total knee replacement?

A.      I mean, when we talk to patients about this, we try and remind them that this is a serious procedure. And I think that it goes without saying that pretty much, as I explain to patients, anything that you could imagine could go wrong.

There are – between hip and knee replacement surgeries in this country, close to a million operations done every year. And if you're into statistics, just imagine one in a million. I mean, pretty much anything can happen.

*So I think it's really important for us as physicians to spend time and*

*to explain to them that bad things can and do happen in spite of everybody's best efforts. I mean, it's virtually impossible to suggest to somebody that risks – you know, they could be managed, but they are there. And I think it's important for us as physicians, certainly part of Dr. Cook's records, that was discussed, but it's important for the patients to appreciate that.*

And I think that we all have our own ways of getting that across to patients. But it goes without saying it's everything up to and including life-threatening, end-of-the-world problems are considered possible.

In fact, when I tell my patients, I'll often say that, you know, we all understand that you might not survive the surgery, but I'll then look at the spouse and maybe saying (inaudible) that's actually more of their problem because that's the one who's going to be left, what do I do now?

*And I said the real complications are those that you live through, you know, whether it be infections or injuries to nerves, blood vessels, things of that nature.*

Q.      *You've had an opportunity to review Dr. Cook's records – and I'm not going to put them all up there – but based on your review of the records, did you see documentation that he had a discussion with the patient about risk, benefits, et cetera?*

[PLAINTIFFS' COUNSEL]: Objection.

[THE COURT]: I'll allow it for right now. Overruled.

. . .

A.      *Yes. That was part of the office record, something that I did look at, that acknowledged that in his office notes that he had spoken to Rau about the inherent risks of the operation including injuries to nerves and blood vessels.*

Q.      *Thank you. Would that be reasonable within the standard of care for him to have such a discussion with a patient like Rau prior to surgery?*

[PLAINTIFFS' COUNSEL]: Objection.

[THE COURT]: Overruled.

A.      *I would absolutely expect that to occur in advance of surgery.*

(Emphasis added.)   Tr. Vol. IV, p. 14-16.

{¶ 12} Dr. Abraham also testified as to whether Dr. Cook acted reasonably and within the standard of care:

Q.      Now, you've reviewed the operative report prepared by Dr. Cook for Rau's surgery. Anything unusual or concerning in his technique as reflected by the operative report?

A.      No.

Q.      Did it appear to be reasonable and within the standard of care?

A.      Yes.

Q.      Anything that was untoward or unusual that appeared to occur during that surgery?

A.      No.

Q.      All right. Are you aware that Rau has suffered an injury to the

popliteal artery as a result of that surgery?

A.	Yes.

Q.	All right. With that knowledge and based on your review of the records, did you form an opinion to a reasonable medical probability, based on your education, experience and training, as to whether Dr. Cook met the standard of care in his treatment, his surgery of Rau?

A.	Yes, I did formulate an opinion.

Q.	What was your opinion?

A.	That he did.

Q.	How did he meet the standard of care when his patient suffered a popliteal artery injury during surgery he performed?

A.	I think it's always one of the challenges in terms of – we, as physicians, take care of patients and – and complications are unfortunately part of surgery . . .

So the mere fact that a complication occurs doesn't in and of itself equate with, you know, a substandard care . . .

Tr. Vol. IV, p. 17-19.

{¶ 13} Dr. Cook testified on his own behalf regarding the potential risks or complications that he customarily discussed with his patients, like Rau:

Q.	What do you tell them, if anything, about potential risks or complications and recovery?

A.	. . . *Then we talk about what we do to prevent complications*, and we

discuss start out [sic] with the most common complications, which are about 1 percent, infection, clot, incisions.

*Then we talk about the rarer ones, damage to nerves, muscles, vessels.*

*And I use that as a lead-in to explain to patients that every patient will have a nerve injury after joint replacement because there's a nerve that travels right across the front of our knee and we cut it 100 percent of the time and they end up with some, you know, residual numbness.* That rarely also translates into residual pain.

(Emphasis added.)   Tr. Vol. IV, p. 102-104.   Dr. Cook then explained that, if a patient is "at higher risk, like Rau is a high-risk patient," additional conversations and precautions would be had and taken.   *Id.* at 103-105.

{¶ 14} Dr. Robert Molnar then testified as a vascular surgeon for the defense. Dr. Molnar opined that Rau's popliteal injury resulted from an arterial plaque dissection, a known but fairly rare complication of total knee replacement surgery. He also stated that there was no evidence that Rau's popliteal artery was lacerated by a surgical instrument.

{¶ 15} Lastly, over the Raus' objection, Dr. Kevin Sonn, another orthopedic surgeon, testified for Defendants. In objecting to Dr. Sonn's testimony, the Raus' counsel argued that two other expert orthopedic surgeons—Dr. Cook and Dr. Abraham—had already testified and discussed all aspects of the case in detail and, thus, another orthopedic expert's testimony was cumulative and prejudicial. In turn, defense counsel argued that Dr. Sonn's testimony was from the viewpoint of a younger academic physician

at a Level I trauma center.   The trial court allowed Dr. Sonn to testify as follows:

Q.      As a result of your review of all of those records and depositions, did you form opinions as to whether Dr. Cook met the standard of care in his treatment of Rau?

A.      Yes, I did.

Q.      What was your opinion?

A.      My opinion is that he met the standard of care in his treatment.

. . .

Q.      Are you aware Rau suffered a neurovascular injury as a result of the total knee replacement that was performed on Rau?

A.      Yes.

Q.      Now, you are – of all the physicians who testified in this courtroom, you are the one who completed your training the most recently.

*And when you were trained, were you trained that arterial injuries, neurovascular injuries, are a potential risk of total knee replacement, even when a surgeon does everything appropriately?*

A.      *Yes. Definitely a risk, albeit rare, but definitely a risk.*

. . .

Q.      Let's talk about your opinion in this case briefly.

When you reviewed the records, what opinion did you form as to how the injury occurred?

A.      Yeah. So upon review of the records, it's most likely an indirect injury

to the artery slowly developed to an occlusion over time.

. . .

Q.      *Dr. Molnar, a vascular surgeon, just testified shortly ago that based on his review of the CT arteriogram and the records, the cause of Rau's arterial injury was an arterial dissection.*

        *Is that consistent with your opinions that you formed in this case?*

[PLAINTIFFS' COUNSEL]: Objection. He's now going into the CTA. We've already had a vascular surgeon.

[THE COURT]: I'm going to overrule. It's just what his review of the records are. That's all.

A.      *Yeah, I think it's most consistent with that based on the presentation and – and the records.*

Q.      Based on your review of the records, do you have an opinion to a reasonable medical probability based on your education, experience, and training, as well as the depositions, as to whether Dr. Cook met the standard of care in the actual performance of the surgery?

A.      Yes, I feel he met the standard of care in performing the surgery.

(Emphasis added.)   Tr. Vol. V, p. 94-98.

{¶ 16} In closing argument, defense counsel emphasized the expert testimony, stating "all these defense experts" acknowledge that "popliteal artery injury" is a known risk and complication of the surgery. The jury returned a defense verdict, finding no malpractice by Dr. Cook. This appeal followed.

## II. Assignments of Error

{¶ 17} Appellants assert the following two assignments of error:

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PREJUDICIAL ERROR IN ALLOWING EVIDENCE OF INFORMED CONSENT AND DISCUSSIONS OF SPECIFIC RISKS OF THE PROCEDURE.

THE PRESENTATION OF CUMULATIVE EXPERT TESTIMONY WAS PREJUDICIAL ERROR.

{¶ 18} Evid.R. 402 permits the inclusion of any evidence relevant to the underlying claim, stating:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible.

{¶ 19} Evid.R. 403, however, governs the exclusion of relevant evidence on grounds of prejudice, confusion or undue delay, providing:

(A) Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

(B) Exclusion discretionary. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue

delay, or needless presentation of cumulative evidence.

{¶ 20} "In reaching a decision involving admissibility under Evid.R. 403(A), a trial court must engage in a balancing test to ascertain whether the probative value of the offered evidence outweighs its prejudicial effect." *Neugebauer v. Farinacci*, 2024-Ohio-960, ¶ 36 (8th Dist.), quoting *State v. Wright*, 2019-Ohio-4460, ¶ 50, citing *State v. Maurer*, 15 Ohio St.3d 239 (1984), paragraph seven of the syllabus. "Trial courts are afforded broad discretion in balancing the probative value of evidence against the danger of unfair prejudice." *Id.*, citing *State v. Bethel*, 2006-Ohio-4853, ¶ 171. "Unfair prejudice" is that quality of evidence which might result in an improper basis for a jury decision. *Oberlin v. Akron Gen. Med. Ctr.,* 91 Ohio St. 3d 169, 172 (2001). "Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial." *Id.*

{¶ 21} "The admission or exclusion of evidence is generally within the sound discretion of the trial court, and a reviewing court may reverse only on the showing of an abuse of that discretion." *R.T. v. Knobeloch*, 2018-Ohio-1596, ¶ 68 (10th Dist.), citing *Peters v. Ohio State Lottery Comm.*, 63 Ohio St.3d 296, 299 (1992). " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶ 22} In their first assignment of error, the Raus contend that the trial court erred by allowing evidence of informed consent and discussions with Rau regarding risks and complications of knee replacement surgery. Specifically, they argue that, because neither

party raised informed consent as a claim or defense, evidence of informed consent, the consent forms, and discussions with Rau about the risks and complications of the procedure related to informed consent were irrelevant and unduly prejudicial and, thus, should have been excluded. We agree.

{¶ 23} The Raus assert that evidence of informed consent and discussions of the risks of a procedure related to informed consent are inadmissible in a direct medical negligence case. In support of their argument, they cite *Waller v. Aggarwal*, 116 Ohio App.3d 355, 357-58 (11th Dist. 1996). In *Waller*, the court concluded that the plaintiff was substantially prejudiced by the references to informed consent, reasoning that the plaintiff's action was not sounded in nonconsensual battery nor had the plaintiff alleged that she was not fully apprised of the risks of the procedure. *Id.* at 357. The court reasoned that, even if the plaintiff had been informed that a certain injury was a risk of the procedure, the fact that the plaintiff was informed of that risk could not be a defense to a claim of medical negligence. *Id.* The court explained that the admission of evidence pertaining to the risk issue and references to that issue carried great potential for the confusion of the jury. *Id.* at 358. The court therefore held that references to informed consent made during the trial constituted plain error because those references were "apparent on their face and prejudicial."

{¶ 24} Here, like in *Waller*, the issue of informed consent was not relevant to the claim of negligence. Although such evidence may have been relevant to demonstrate that arterial injuries may occur during knee replacement surgery in the absence of negligence, this theory could have been and, in this case, was demonstrated through the testimony

of experts. Thus, there was no need to introduce evidence of any risk discussions between Dr. Cook and Rau with respect to Rau's knee replacement surgery. Even if Rau was informed that an arterial or neurovascular injury was a risk of the procedure, the fact that Rau was informed of that risk could not be a defense to a claim of medical negligence. Moreover, the fact that Rau consented to the surgery and was informed of its risks did not grant consent for the procedure to be performed negligently and did not waive his right to recourse in the event the procedure was performed negligently.

{¶ 25} Dr. Abraham spoke extensively regarding the risks associated with knee replacement surgery. He emphasized that it is important for physicians to explain the risks to patients. He specifically stated that injuries to nerves and blood vessels are the types of complications that may occur. He then noted that he had reviewed Dr. Cook's records regarding Rau and confirmed that Dr. Cook had documented discussions with Rau about the risks of the surgery, including injuries to nerves and blood vessels. He further stated that Dr. Cook had acted within the standard of care by having those risk discussions with Rau prior to surgery.

{¶ 26} Dr. Cook also testified that he tells his patients, like Rau, about potential risks or complications of surgery, including damage to nerves and vessels, and that every patient will have a nerve injury after knee replacement. Dr. Sonn then testified that arterial and neurovascular injuries are potential risks of total knee replacement even when a surgeon does everything appropriately, and he agreed with Dr. Molnar's opinion regarding the nature of Rau's injury, namely an arterial plaque dissection.

{¶ 27} Although the trial court properly granted the Raus' motion in limine

regarding informed consent, it only excluded admission of the informed consent form itself and allowed extensive evidence of discussions regarding Rau's presumed understanding of the risk of the surgery following his conversations with Dr. Cook. In other words, despite the trial court's orders not to present testimony regarding the specific risks of knee replacement surgery and not to present evidence as to what Rau was told concerning those risks before surgery, Defendants' experts still testified as to those issues. We conclude that these erroneous admissions were unduly prejudicial to the Raus' case. The first assignment of error is sustained.

{¶ 28} In their second assignment of error, the Raus argue that Dr. Abraham's and Dr. Sonn's testimonies were essentially the same, as they simply agreed that Dr. Cook satisfied the standard of care in his treatment of Rau. The Raus point out that defense counsel asked Dr. Sonn if his opinion was also consistent with Dr. Molnar's opinion—that Rau's arterial injury was an arterial plaque dissection—and Dr. Sonn agreed. The Raus contend that the trial court erred in allowing the presentation of cumulative expert testimony after the court had granted their motion in limine, which prejudiced them and constituted reversible error.

{¶ 29} "Evid.R. 403(B) provides that relevant evidence is not admissible if its probative value is substantially outweighed by consideration of undue delay or needless presentation of cumulative evidence, and a trial court has the discretion to exclude expert testimony where the testimony would not assist the trier of fact." *Knobeloch,* 2018-Ohio-1596, at ¶ 69 (10th Dist.), quoting *Holman v. Shiloh Grove L.P.*, 2016-Ohio-2809, ¶ 16 (10th Dist.), citing *Bostic v. Connor*, 37 Ohio St.3d 144 (1988), paragraph three of the

syllabus. "Cumulative evidence is additional evidence of the same kind to the same point." *Id.*, quoting *Kroger v. Ryan*, 83 Ohio St. 299 (1911), paragraph one of syllabus.

{¶ 30} In this case, the trial court granted the Raus' motion in limine to exclude cumulative testimony. The Raus argue that Defendants' two orthopedic experts then testified and relied on the exact same evidence to deliver identical opinions. The Raus point out that defense counsel argued that the testimonial evidence of Dr. Abraham and Dr. Sonn was not cumulative because the witnesses came from different backgrounds (private practice versus academic institution), and one was young and the other was older. They contend that defense counsel's argument had no basis under the law and that Defendants' two orthopedic experts' presentation of the exact same testimony based on the exact same evidence constituted cumulative evidence. We agree.

{¶ 31} Here, the trial court had already granted the Raus' motion in limine to exclude cumulative testimony. Dr. Cook testified on his own behalf, and the court then permitted Dr. Molnar, a vascular surgery expert, and two orthopedic surgery experts to also testify that Dr. Cook met the standard of care based on the same evidence. Dr. Sonn not only opined that Dr. Cook met the standard of care but also simply agreed with Dr. Molnar's opinion as to the presumed nature of Rau's injury.

{¶ 32} As the Raus point out, all experts come from different backgrounds, different schools, different employers, and different ages. These factors are not what preclude evidence from being deemed cumulative. What determines whether evidence is cumulative is whether the additional evidence goes to prove the same point already proven by other evidence. Because Dr. Cook, Dr. Molnar, and Dr. Abraham had already

testified as to the nature of Rau's injury, that Rau's injury had been a known risk of knee replacement surgery, and that Dr. Cook had met the standard of care in performing Rau's surgery, we do not believe that Dr. Sonn's testimony added anything to the evidence already presented, even if he was testifying from the viewpoint of a younger surgeon employed at an academic medical center.

{¶ 33} Each expert was only permitted to testify as to his expertise and opinion. Dr. Sonn, however, while testifying from the viewpoint of a younger academic surgeon, offered the same testimony as the other experts that arterial and neurovascular injuries are potential risks of knee replacement surgery, and that he agreed with Dr. Molnar's expert opinion that the cause of Rau's injury was an arterial dissection. Given that the jury had already heard the substance of Dr. Sonn's testimony from other experts, and the trial court had already granted the Raus' motion in limine to exclude cumulative evidence, we conclude that that the trial court acted arbitrarily in permitting Dr. Sonn to also testify as to the same evidence over the Raus' objection, and thus abused its discretion. The second assignment of error is sustained.

### III. Conclusion

{¶ 34} Having sustained the Raus' assignments of error, we reverse the trial court's judgment and remand the cause for further proceedings consistent with this opinion.

. . . . . . . . . . . .

EPLEY, P.J., concurs.

TUCKER, J., dissents:

{¶ 35} In my opinion, the trial court did not abuse its discretion by allowing testimony that injury to the popliteal artery is a known complication of knee replacement surgery that can occur in the absence of negligence or in permitting limited informed consent testimony from Dr. Abraham and Dr. Cook concerning the discussion had with Rau about the risks and complications of knee replacement surgery. But, even assuming error with the informed consent testimony, it was harmless. I additionally conclude the trial court did not abuse its discretion by allowing Defendants to call two retained orthopedic surgeons to provide standard of care testimony and opinions. But once again, even assuming error, it was harmless. I therefore respectfully dissent.

{¶ 36} The case was presented to the jury as a medical negligence case, with the Raus asserting that Dr. Cook had breached the standard of care by first cutting Rau's right popliteal artery with a surgical instrument and then failing to timely recognize and react to the arterial injury. Under the Raus' theory, this negligence caused the blood flow to Rau's right leg to be severely compromised and resulted in emergency surgery which saved the leg but nonetheless left a quite severe and permanent injury. Dr. Cook, in contrast, asserted that he performed the surgery within the standard of care and that his recognition of and reaction to the injury were appropriate. As to the mechanism of injury, Dr. Cook presented expert testimony from Dr. Molnar, a vascular surgeon, that the popliteal artery had not been cut during surgery. Instead, Dr. Molnar opined that, out of necessity, Rau's right knee had been hyperflexed during surgery, which allowed plaque in the surrounding area to break off and push the "inner layer [of the artery] into the lumen," the hollow space within an artery that allows blood flow. Tr. Vol. V, p. 26.

According to Dr. Molnar, this caused the artery to narrow, which resulted in an occulated artery and, ultimately, Rau's injury. Dr. Molnar further testified that a popliteal artery occlusion caused by plaque breaking off and blocking blood flow is a known but "fairly rare" complication of knee replacement surgery. Tr. Vol. IV, p. 32.

**{¶ 37}** After the jury was selected but before the opening statements were presented, a fairly lengthy discussion occurred between counsel and the trial judge concerning the Raus' motions in limine to exclude testimony from Dr. Cook's witnesses regarding both informed consent and the risks and complications of knee replacement surgery. The trial court denied the liminal motion concerning known complications, stating that Dr. Cook's experts could "tell the jurors about known and recognized complications." Tr. Vol. I, p.10. The trial court sustained, at least in part, the liminal motion regarding informed consent.[1] In response to the trial court's ruling, Dr. Cook's counsel had the following discussion with the court:

> [DEFENSE COUNSEL]: . . . So but we can still talk about the fact that from
>
> our perspective it is a known risk that can occur?

---

[1] The trial court's ruling was a bit unclear but, based on subsequent evidentiary rulings, the trial court's decision allowed a general discussion concerning the surgical risks of which Rau had been informed, but prohibited Dr. Cook from introducing testimony that Rau had been informed that an injury to the popliteal artery was a known complication. Though not necessary to this dissent, I do take issue with the trial court's general versus specific distinction, because the Raus' expert, Dr. Sauer, testified that injury to the popliteal artery during knee replacement surgery is a so called "never event," meaning that without surgical negligence such an injury cannot occur. Tr. Vol. III, p. 20-21. In light of this "never event" characterization, testimony that Rau had been informed that injury to the popliteal artery was a known surgical complication was relevant, because such testimony would have made it more likely that a popliteal injury was a known complication that could occur without negligence as opposed to a "never event." Any concern that such specific testimony could confuse or mislead the jury could have been addressed by a jury instruction informing the jury of the purpose of the testimony.

THE JUDGE: That is correct.

[DEFENSE COUNSEL]: Even in the absence of negligence?

THE JUDGE: That is correct.

[DEFENSE COUNSEL]: Okay.

THE JUDGE: But there is no claim for - - they're not arguing informed consent, so I'm not going to go there.

[DEFENSE COUNSEL]: Okay. That's fine.

Tr. Vol. I, p. 12.

Following this discussion, the trial proceeded, during which the testimony the majority opinion finds irrelevant and prejudicial occurred, as set forth in the majority opinion.

## Surgical Risks/Informed Consent

{¶ 38} The Raus' "informed consent" assignment of error asserts that the trial court abused its discretion by allowing testimony regarding informed consent and the risks and complications of knee replacement surgery. To determine whether a trial court has abused its discretion, an appellate court determines whether the contested decision was arbitrary, unconscionable, or unreasonable. *Hoke v. Miami Valley Hosp.*, 2020-Ohio-3387, ¶ 30 (2d Dist.). Addressing first the testimony about the known risks and complications, a physician may defend a surgical negligence claim by asserting that the injury at issue was a known complication of the surgery which could occur within the standard of care. *Witzmann v. Adam*, 2011-Ohio-379 (2d Dist.); *Hoke* at ¶ 30.

{¶ 39} In *Witzmann*, the defendant doctor (Adam), who prevailed at trial, had

performed thyroid surgery on Witzmann, which resulted in an injury to Witzmann's laryngeal nerve; the nerve injury resulted in damage to Witzmann's left vocal cord. As in the present case, there was no dispute that the nerve had been injured as a result of the surgery. The question was whether the nerve injury had been caused by surgical negligence. The parties presented competing expert testimony. Witzmann's experts opined that the nerve injury could not have occurred without negligence. The defense expert testified that Adam had appropriately identified the laryngeal nerve and mapped its course as far as possible, that there was an area where the nerve cannot be visualized and the injury occurred in this area, and that, because of this situation, injury to the laryngeal nerve during thyroid surgery is a known complication that can occur without negligence.

{¶ 40} On appeal, Witzmann argued that the trial court erred by allowing the defense expert's testimony about complications of surgery. We disagreed, stating:

> The dispute concerns whether Adam adequately protected the recurrent laryngeal nerve. It was Witzmann's experts' opinion that he did not. They believed that when there are no complications a surgeon of ordinary skill, care, and diligence can always avoid cutting the nerve. Conversely, [defense expert] Dr. Cummings cited medical studies showing that even in the absence of complications severe injury to the nerve occurs in a small number of cases. He described how a surgeon might injure the nerve in the area where it is most vulnerable near the suspensory ligament, even though the surgeon had identified it and traced its path. Dr. Cummings

therefore opined that a surgeon of ordinary skill, care, and diligence could severely injure the nerve even though his conduct conformed to the standard of care. It was Dr. Cummings's opinion that this is what happened during Witzmann's thyroidectomy.

Dr. Cummings's testimony alone is substantial, probative evidence that supports Adam's defense that he did not breach the standard of care and was not negligent.

*Witzmann* at ¶ 36-37.

{¶ 41} In *Hoke v. Miami Valley Hosp.*, Hoke suffered from several gynecological issues. After conservative treatment failed, surgical intervention occurred. During the surgery, Hoke's iliac vein was injured, requiring a surgical repair. The plaintiff's experts opined that surgical negligence caused the iliac vein injury. In contrast, a defense expert testified that, based upon the nature of the surgery, "injury to the iliac vein is a risk and complication that can occur within the standard of care." *Hoke* at ¶ 25. The jury decided in favor of the defendant doctor.

{¶ 42} On appeal, Hoke argued that "the trial court erred in allowing testimony about the injury to Mrs. Hoke's vein being a 'recognized complication' or a 'complication of surgery.' " *Id.* at ¶ 35. Hoke asserted that such testimony "misled the jury into believing tort liability does not attach to such 'complications' even when a doctor fails to meet the applicable standard of care." The plaintiff further argued that the complication of surgery testimony "suggested the damage to Mrs. Hoke's iliac vein was a 'natural consequence of the procedure' and, therefore, not the result of negligence." *Id.*

**{¶ 43}** We rejected these arguments, concluding that we found "no error in the trial court allowing testimony about the [iliac vein] injury . . . being a 'recognized complication' or a 'complication of surgery.' "   *Id.* at ¶ 39.   We explained this rejection as follows:

> The crucial question then, which was made clear to the jury, was whether Mrs. Hoke's injury was caused by something Dr. Miller [defendant doctor] did that was outside the standard of care, or whether the injury occurred despite the fact that Dr. Miller did everything correctly and met the standard of care. The defense argued and presented evidence that [Dr. Miller] met the standard of care despite the fact that the iliac vein was injured. The Hokes argued and presented evidence to the contrary. After hearing the conflicting evidence, the jury rendered a verdict finding [Dr. Miller was] not negligent, indicating that [he] did not violate the applicable standard of care notwithstanding the injury that occurred.

*Id.* at ¶ 41.

**{¶ 44}** Given this case law, the trial court correctly overruled the Raus' motion in limine seeking to limit testimony that the injury to Rau's popliteal artery is a known complication of knee replacement surgery that can occur without negligence.   Thus, I disagree with the majority opinion's conclusion that the risk of surgery testimony was irrelevant and prejudicial.   Moreover, the complication of surgery testimony set forth in the majority opinion was not subject to an objection, triggering a plain error analysis.   In a civil case, plain error is "not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the

trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Curry v. Bettison*, 2023-Ohio-1211, ¶ 59 (2d Dist.), quoting *Goldfuss v. Davidson*, 179 Ohio St.3d 116 (1997), at syllabus.   This certainly is not such a case.[2]

{¶ 45} Turning to the issue of informed consent, a physician cannot be shielded from liability for his negligence by asserting that the patient, having been advised of the possibility of a surgical injury but nonetheless having gone forward with the surgery, has consented to a negligently inflicted injury.   Allowing such a defense would, quite obviously, constitute prejudicial error.   But that is not what occurred here.

{¶ 46} In *Waller v. Agarwal*, 116 Ohio App. 3d 355 (11th Dist.), the case relied upon by the majority opinion, in a typical malpractice case involving a perforated bladder which occurred during some sort of laparoscopic surgery, the trial court mentioned informed consent to prospective jurors before jury selection began, allowed defense counsel to discuss informed consent during his opening statement and closing argument, allowed defense counsel to cross-examine the plaintiff regarding informed consent and also to question the defendant doctor regarding the issue, and most egregiously, submitted a jury interrogatory asking the jury whether the plaintiff, by being informed of the risks of surgery but proceeding with the procedure, "waived her rights."   *Id.* at 358.

{¶ 47} Under those facts, the Eleventh District correctly ruled that the trial court had erred and the plaintiff had been prejudiced by the trial court's allowing informed

---

[2] A trial court's ruling on a motion in limine is interlocutory.   As such, the Raus' "known complication" motion in limine did not preserve the issue for appellate review; to do so, a trial objection was needed.   *Gable v. Gates Mills*, 2004-Ohio-5719, ¶ 35.

consent to be a central – if not dominant – issue in the trial. But the present case is in sharp contrast to what occurred in *Waller*. There was no suggestion by Dr. Cook or by the trial court, through the jury instructions or otherwise, that Rau, by being informed of surgical risks, had consented to negligent surgical performance or to negligent post-operative care.

{¶ 48} During his direct examination, Dr. Cook was asked one question about the risks of surgery he discussed with Rau. There was no objection to this question. Plain error is certainly not demonstrated by this one question. Dr. Abraham was asked two questions about Dr. Cook's discussion with Rau about the risks of knee replacement surgery as follows:

Q. You've had an opportunity to review Dr. Cook's records -- and I'm not going to put them all up there -- but based on your review of the records, did you see documentation that he had a discussion with the patient about risk, benefits, et cetera?

[PLAINTIFF'S COUNSEL]: Objection.

[THE COURT]: I'll allow it for right now. Overruled.

. . .

A. Yes. That was part of the office record, something that I did look at, that acknowledged that in his office notes that he had spoken to Rau about the inherent risks of the operation including injuries to nerves and blood vessels.

Q. Thank you. Would that be reasonable within the standard of care for

him to have such a discussion with a patient like Rau prior to surgery?

[PLAINTIFF'S COUNSEL]: Objection.

[THE COURT]: Overruled.

A.     I would absolutely expect that to occur in advance of surgery.

Tr. Vol. IV, p. 16.

{¶ 49} The first question, which is consistent with the trial court's ruling allowing general testimony concerning what Rau was told regarding the risks of knee replacement surgery, was relevant in my view because, if Rau was informed that a blood vessel injury was a known complication of surgery, it made it more likely that a popliteal artery injury, in contrast to Dr. Sauer's "never event" testimony, was a known complication of knee replacement surgery that can occur within the standard of care.   Admittedly, the relevance of the follow-up standard of care question was minimal at best, but I cannot conclude the trial court acted unreasonably by allowing the follow-up question.

{¶ 50} On the informed consent issue, I finally conclude that even assuming the trial court's evidentiary rulings on this issue were erroneous, any error was harmless. Civ.R. 61 provides as follows:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must

disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

From this, the Ohio Supreme Court has stated that "an improper evidentiary ruling constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice." *Beard v. Meridian Huron Hosp.*, 2005-Ohio-4787, ¶ 35. To determine whether a party's substantial rights have been affected by an erroneous evidentiary ruling, an appellate court "must weigh the prejudicial effect of the trial court's errors and determine whether, but for those errors, 'the jury . . . would probably have made the same decision.' " *Id.*, quoting *O'Brian v. Angley*, 63 Ohio St.2d 159, 164-165 (1980), quoting *Hallworth v. Republic Steel Corp.*, 153 Ohio St. 349 (1950), paragraph three of the syllabus. Under this standard, I conclude that if the jury had not heard the very general informed consent testimony, the jury's verdict would very probably have been the same. I reach this conclusion because the informed consent testimony was minimal, the topic was not discussed in Dr. Cook's opening statement or closing argument, and the jury instructions were standard medical malpractice instructions. There was simply nothing presented to the jury which suggested that Rau, by being informed of possible surgical risks but proceeding with the surgery, consented to either the surgery's being negligently performed or to negligent post-operative care.

{¶ 51} Based upon the above, I dissent from the majority opinion's resolution of the first assignment of error.

**Cumulative Expert Testimony**

{¶ 52} Under the second assignment of error, the majority opinion also concludes that the trial court acted arbitrarily and thus abused its discretion by allowing the testimony of Dr. Sonn, a second retained standard of care expert, over the Raus' objection. An arbitrary decision is one which is made without an adequate defining principle or without consideration of the facts and circumstances of the case. *State v. Hill*, 2022-Ohio-4544, ¶ 9. It is a somewhat unusual conclusion; most abuse of discretion determinations turn on whether the decision is unreasonable. *Hoke,* 2020-Ohio-3387, at ¶ 30 (2d Dist.). The basis for the conclusion that the court acted arbitrarily seems to be that the trial court sustained the Raus' motion in limine to exclude cumulative expert testimony but then allowed such testimony. I agree that the trial court's liminal decision was at odds with the allowance of Dr. Sonn's standard of care testimony. That being said and as already discussed, however, a motion in limine ruling is tentative; it permits the trial court "to change its mind." Such a change does not necessarily make the ultimate decision arbitrary. Moreover, allowing a second standard of care opinion from an expert with a different background and with different experiences was neither arbitrary nor unreasonable. It may not be the decision another trial judge would have made, but that, of course, does not make the decision an abuse of discretion. This, quite simply, was the type of trial decision where the trial court's discretion, though not unlimited, was quite broad. As such, I cannot conclude the trial court abused its discretion by allowing Dr. Sonn's testimony.

{¶ 53} Moreover, assuming the trial court abused its discretion and, thus, erred, the error was harmless. I reach this conclusion because, under the standard already

discussed, allowing Dr. Sonn's testimony in all probability did not affect the jury's verdict.

{¶ 54} Based upon the above discussion, I also dissent from the majority opinion's resolution of the second assignment of error.